VIVID ENTERTAINMENT, LLC; Califa Productions, Inc.; Jane Doe a/k/a Kayden Kross, Plaintiff,

v.

Jonathan FIELDING, Director of Los Angeles County Department of Public Health; Jackie Lacey, Los Angeles County District Attorney, and County of Los Angeles, Defendants.

**Case No. CV 13–00190 DDP (AGRx).**

United States District Court, C.D. California.

Aug. 16, 2013.

H. Louis Sirkin, Santen and Hughes LPA, Cincinnati, OH, Janet Lynn Grumer, Matthew D. Peterson, Davis Wright Tremaine LLP, Los Angeles, CA, Paul J. Cambria, Jr., Timothy P. Murphy, Lipsitz Green Scime Cambria LLP, Buffalo, NY, Robert Corn–Revere, Ronald G. London, Davis Wright Tremaine LLP, Washington, DC, for Plaintiff.

Andrea E. Ross, Los Angeles, CA, John K. Ly, Glaser Weil Fink Jacobs Howard Avchen & Shapiro LLP, Los Angeles, CA, for Defendants.

ORDER DENYING IN PART AND GRANTING IN PART INTERVENERS' MOTION TO DISMISS; DENYING IN PART AND GRANTING IN PART PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION; AND VACATING PLAINTIFFS' MOTION FOR JUDGMENT ON THE PLEADINGS

[Docket Nos. 49, 55, 64]

DEAN D. PREGERSON, District Judge.

## I. Background

Plaintiffs Vivid Entertainment, LLC ("Vivid") and Califa Productions, Inc., produce adult films. (Compl. ¶¶ 8–9, Docket No. 1.) Plaintiffs Jane Doe, known professionally as Kayden Kross ("Ms. Kross"), and John Doe, known professionally as Logan Pierce ("Mr. Pierce"), are performers who appear in adult films. (Id. ¶¶ 10–11.)

The adult film industry regularly tests actors for sexually transmitted infections ("STIs"). (Id. ¶¶ 20–31.) During the November 2012 elections, Los Angeles County passed, via referendum, The County of Los Angeles Safer Sex in the Adult Film Industry Act ("Measure "B"). (Id. ¶ 36; Docket No. 58–1 Ex. B text of Measure B); Los Angeles County Code § 11.39 ("§ 11.39"), et seq. (codifying Measure B). Measure B forces producers of adult films, before any production can occur, to pay a fee and obtain a permit from the County Department of Public Health (the "Department"), which is tasked with enforcing Measure B. (Id. ¶ 41–43.) The Department of Public Health, set the permit fee in the range of $2,000 to $2,500 per year. (Compl. ¶ 48.) Once approved, the film producers must display the permit at all times during filming. (Id. ¶ 41.) A permit is valid for two years, but is, at all times, subject to immediate revocation. (Id.) Once a permit is granted, Measure B requires that performers engaging in anal or vaginal sexual intercourse to use condoms during filming. (Compl. ¶ 42.)

Department inspectors are granted access to "any location suspected of conducting any activity regulated by" Measure B, without notice. § 11.39.130. Inspectors can look at personal property or private documents from any person present at any location if there is suspicion of a Measure B violation. See id.

Plaintiffs have sued various County officials for Declaratory and In-

junctive Relief. (*See generally* Compl.) Because Defendants have declined to defend Measure B's constitutionality, this Court has allowed Michael Weinstein, Marijane Jackson, Arlette De La Cruz, Mark McGrath, Whitney Engeran, and the Campaign Committee Yes on B, Major Funding by the AIDS Healthcare Foundation ("Interveners") to intervene. (*See generally* Order Granting Motion to Intervene, Docket No. 44; Order Denying Plaintiffs' Motion for Reconsideration, Docket No. 78.) Interveners were Measure B's official proponents. (*Id.* at 2:19–20.) Presently before the Court is Interveners' Motion to Dismiss and Plaintiffs' Motion for a Preliminary Injunction. (Docket Nos. 49, 55.)[1]

## II. *Legal Standard*

### A. *Motion to Dismiss*

A complaint will survive a motion to dismiss when it contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). When considering a Rule 12(b)(6) motion, a court must "accept as true all allegations of material fact and must construe those facts in the light most favorable to the plaintiff." *Resnick v. Hayes,* 213 F.3d 443, 447 (9th Cir.2000). Although a complaint need not include "detailed factual allegations," it must offer "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937. Conclusory allegations or allegations that are no more than a statement of a legal conclusion "are not entitled to the assumption of truth." *Id.* at 679, 129 S.Ct. 1937. In other words, a pleading that merely offers "labels and conclusions," a "formulaic recitation of the elements," or "naked assertions" will not be sufficient to state a claim upon which relief can be granted. *Id.* at 678, 129 S.Ct. 1937 (citations and internal quotation marks omitted). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Id.* at 679, 129 S.Ct. 1937.

### B. *Motion for Preliminary Injunction*

"[P]laintiffs seeking a preliminary injunction must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest." *Sierra Forest Legacy v. Rey,* 577 F.3d 1015, 1021 (9th Cir.2009) (citing *Winter v. Natural Resources Defense Council, Inc.,* 555 U.S. 7, 29, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008)).

## III. *Motion to Dismiss Analysis*

After reviewing Interveners' motion to dismiss, the Court GRANTS dismissal of Plaintiffs' claim that ballot initiatives cannot, as a matter of law, implicate First Amendment rights, that state law preempts Measure B, and that Measure B violates Plaintiffs' due process rights (with

---

1. Plaintiffs argue the motion to dismiss is untimely because the County has already filed an answer in this case. Generally, motions to dismiss must be filed before an answer. *United States v. Real Prop. Located at 41430 De Portola Rd., Rancho California,* 959 F.2d 243 (9th Cir.1992). It is unclear, though, how this rule is applied in the intervener context. Regardless, should the rule apply to Interveners, the Court uses its discretion to convert the motion to dismiss into a motion for judgment on the pleadings, which is analogous to a motion to dismiss except that it may be filed after an answer. *See id.*

the exception of Plaintiffs' Fourth Amendment claim). The Court DENIES dismissal on the remaining claims.

## A. *Standing*

 Interveners claim that Plaintiffs do not have standing. Standing is a "threshold question." *Nat'l Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 255, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994). The doctrine "is founded in concern about the proper—and properly limited role—of the courts in a democratic society." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The constitutional requirements of standing are:

> (1) injury in fact, by which we mean an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) a causal relationship between the injury and the challenged conduct, by which we mean that the injury fairly can be traced to the challenged action of the defendant, and has not resulted from the independent action of some third party not before the court; and (3) a likelihood that the injury will be redressed by a favorable decision, by which we mean that the prospect of obtaining relief from the injury as a result of a favorable ruling is not too speculative.

*Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,* 508 U.S. 656, 663–664, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993). Plaintiffs have the burden of showing they have standing. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 562, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). "[I]t is sufficient for standing purposes that the plaintiff intends to engage in a course of conduct *arguably* affected with a constitutional interest and that there is a credible threat that the challenged provision will be invoked against the plaintiff." *Arizona Right to Life Political Action Comm. v. Bayless,* 320 F.3d 1002, 1006 (9th Cir.2003) (internal quotation marks and citations omitted) (emphasis added).[2] "Thus, when the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *Id.* Even outside the First Amendment context, pre-enforcement standing is appropriate when the issue is a purely legal one and it would be costly to comply with the challenged law or regulation. *See Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

 Here, standing is appropriate. Vivid and Califa, collectively, make, produce, and distribute adult films, and their principle place of business is Los Angeles. (Compl. ¶¶ 8–9.) Plaintiffs Kross and Pierce perform in adult films produced Los Angeles. (*Id.* ¶¶ 10–11.) On December 14, 2012, the Department sent a letter to the "Producers of Adult Films in Los Angeles County, indicating what steps the Department would take in implementing and enforcing Measure B." (Docket No. 56 Ex. 1; *see also* Compl. ¶¶ 55, 61, 76, 89, 97.) Vivid has presented evidence that, as a result of Measurer B's passage, it has stopped shooting adult films in Los Angeles, and has thus lost the value of the non-Measure B filming permits for which it has already paid. (Hirsch Decl. ¶¶ 20–21.)[3]

**2.** The word "arguably" is important because standing must be decided before the merits are reached. *George E. Warren Corp. v. U.S. E.P.A.,* 164 F.3d 676 (D.C.Cir.1999).

**3.** "In evaluating a plaintiff's standing at the motion to dismiss stage, a court may consider not only the allegations in the complaint, but also factual averments made by declaration or affidavit." *Am. Tradition Inst. v. Colorado,* 876 F.Supp.2d 1222, 1232 (D.Colo.2012); *Vildosola v. Hornbeak,* No. CV 08–6590–VAP JEM, 2010 WL 1507100, at *8 (C.D.Cal. Feb.

Vivid has also presented evidence that filming outside Los Angeles creates several difficulties: performers are generally less available to film outside the County, fewer support services are available outside the County, and fewer suitable locations exist outside the County. (*Id.* ¶¶ 28–32.) Moreover, Kross attests that she prefers to act with a partner not wearing a condom, for reasons that range from comfort to the message she wishes to portray, and she also attests that Measure B has reduced the number of roles in which she has had the opportunity to act. (Kross Decl. ¶¶ 9–11, 15.) Pierce makes similar attestations. (Pierce Decl. ¶¶ 7–11.) In light of the potential First Amendment concerns that Measure B implicates, the costs and consequences of complying with Measure B, and the County's expressed intent to enforce Measure B, Plaintiffs have standing to challenge it. *Bayless,* 320 F.3d at 1006; *see also Abbott Labs.,* 387 U.S. at 149, 87 S.Ct. 1507 (indicating that standing would be proper even outside the First Amendment context).

### B. *Plaintiffs' State Law Preemption Claim*

 Plaintiffs contend that Cal. Labor Code § 144.7 and California Code of Regulations Title 8 § 5193 preempt Measure B (Compl. ¶ 101.) Diversity jurisdiction is not alleged, and, therefore, supplemental jurisdiction, 28 U.S.C. § 1367, is the only means by which this Court may preside over Plaintiffs' state law preemption claim. However, 28 U.S.C. § 1367, grants courts the discretion to "decline to exercise supplemental jurisdiction" over matters that "raise[ ] a novel or complex issue of State law." *Id.; Dream Palace v. Cnty. of Maricopa,* 384 F.3d 990, 1022 (9th Cir.2004).

The Ninth Circuit has upheld a decision to decline supplemental jurisdiction over a claim that state law preempted a county ordinance governing adult entertainment sites. *Dream Palace,* 384 F.3d at 1022. The district court in that case explained that "the remaining state-law claims raise delicate issues involving the interpretation and application of Arizona law and the balance of powers within Arizona between state and local government." *Id.* Since similar concerns about the balance of power in California are present in Plaintiffs' novel preemption claim, this Court declines supplemental jurisdiction.

### C. *Plaintiffs' First Amendment Claim*

 Plaintiffs allege that requiring actors in adult films to wear condoms violates their First Amendment rights. (Compl. ¶¶ 42, 51–56.) Such a requirement is a restriction on conduct. However, not all conduct receives First Amendment protection; only expressive conduct is considered speech and implicates the First Amendment. *See Nordyke v. King,* 319 F.3d 1185, 1189 (9th Cir.2003). The Supreme Court has applied the First Amendment to restrictions on nude dancing, adult movie theaters, adult bookstores, and live adult theater performances because the First Amendment protects sexually explicit speech. *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 224, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) (citing cases). Presently at issue is whether engaging in sexual intercourse for the purpose of making a commercial adult film receives First Amendment protections. The Court is aware of no case that has analyzed this issue. However, given the multitude of cases that have analyzed restrictions on

25, 2010) (looking to declarations to determine standing at the motion to dismiss stage). "[A] suit will not be dismissed for lack of standing if there are sufficient allegations of fact—not proof—in the complaint or *supporting affidavits." Gwaltney of Smithfield, Ltd. v. Chesapeake Bay,* 484 U.S. 49, 65, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) (emphasis added).

adult entertainment under the First Amendment, this Court concludes that sexual intercourse engaged in for the purpose of creating commercial adult films is expressive conduct, is therefore speech, and therefore any restriction on this expressive conduct requires First Amendment scrutiny. *See id.*

Measure B's stated purpose "is to minimize the spread of sexually transmitted infections resulting from the production of adult films in Los Angeles." (Docket No. 58–1 Ex. B, Docket No. 58–1.) Because this purpose focuses on the secondary effects of unprotected speech, rather than the message the speech conveys, it will be reviewed under intermediate scrutiny. *See Fly Fish, Inc. v. City of Cocoa Beach,* 337 F.3d 1301, 1306–09 (11th Cir. 2003) (evaluating an ordinance that prohibited "totally nude" dancing in "adult entertainment establishments" under the *Renton* intermediate scrutiny framework); *Heideman v. S. Salt Lake City,* 348 F.3d 1182, 1196. (10th Cir.2003) (evaluating a similar ordinance under intermediate scrutiny); *see generally Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 47–48, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) (holding that an ordinance that treated "theaters that specialize in adult films" differently should be analyzed under a content neutral, intermediate scrutiny framework because the ordinance was aimed at the secondary effects of those theaters, not their content).[4]

Under intermediate scrutiny narrow tailoring, Interveners must "dem-

4. Plaintiffs state that Measure B requires strict scrutiny review for three reasons. First, Measure B singles out adult films. But the Ordinance in *Renton* also involved a statute that singled out adult theaters. *Renton,* 475 U.S. at 47–48, 106 S.Ct. 925. Plaintiffs' first argument, thus, fails. Second, Plaintiffs argue that *Renton's* reasoning only applies in the context of zoning, because zoning does not prohibit what can be shown, only where something can be shown. Several Circuits have rejected that argument. *See Fly Fish,* 337 F.3d at 1306–09; *Heideman,* 348 F.3d at 1196. The Tenth Circuit has reasoned:

The fallacy in Plaintiffs' argument is to assume that the "adequate alternative avenues of expression" required under the *Renton* line of cases refers exclusively to location. Time, place, or manner regulations all are partial limitations, but each is partial in a different way.... "[M]anner" limitations require alternative ways in which a message may be communicated. A ban on nudity within sexually oriented businesses is a 'manner' regulation, and Plaintiffs have provided no reason to believe that there do not exist other ways to get their message across.

*Heideman,* 348 F.3d at 1196 (citations omitted). Third, Plaintiffs suggest that requiring condoms "so interferes with the message that it essentially bans the message." *City of Erie v. Pap's A.M.,* 529 U.S. 277, 293, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000) (pl. op.).

Plaintiffs' third argument is composed of two sub-arguments, one made at oral argument and the other made in briefing. During oral argument, Plaintiffs stated that Measure B prevents them from making adult films depicting sex during an historical period before condoms existed. The Court notes anachronisms need not detract from a story. Even assuming that condoms interfere with storylines, Plaintiffs' argument, if accepted, would require every manner restriction to be reviewed under strict scrutiny because any manner restriction inherently interferes with a large number of storylines. It is settled law, though, that manner restrictions only trigger intermediate scrutiny. *See Fly Fish,* 337 F.3d at 1306–09; *Heideman,* 348 F.3d at 1196; *City of Erie v. Pap's A.M.,* 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000); *Barnes v. Glen Theatre, Inc.,* 501 U.S. 560, 576, 111 S.Ct. 2456, 115 L.Ed.2d 504 (1991). The condom requirement is analogous to requirements that nude dancers wear pasties and G-strings, both of which are de minimis restrictions on a sexually explicit message that trigger intermediate scrutiny. *Pap's,* 529 U.S. at 294, 120 S.Ct. 1382 (pl. op.) ("Any effect on the overall expression [on account of requiring dancers to wear pasties and G-strings] is de minimis."); *Schultz v. City of Cumberland,* 228 F.3d 831, 847–48 (7th Cir.2000) (noting that pasties and G-strings are analyzed under intermediate scrutiny because they are de

onstrate that the recited harms" to the substantial governmental interest "are real, not merely conjectural, and that the regulation will in fact alleviate those harms in a direct and material way."[5] *Turner Broadcasting System, Inc. v. F.C.C. (Turner I )*, 512 U.S. 622, 664–65, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994). While an ordinance is "not invalid simply because there is some imaginable alternative that might be less burdensome on speech," *Turner Broadcasting System, Inc. v. F.C.C. (Turner II )*, 520 U.S. 180, 217, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997), the Interveners must prove that the statute

does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Turner I*, 512 U.S. at 665, 114 S.Ct. 2445 (internal quotations omitted). In light of the alleged effective, frequent, and universal testing in the adult film industry, Plaintiffs allege sufficient facts, which for purposes of this motion must be assumed true and construed in the light most favorable to Plaintiffs, to show that Measure B's condom requirement does not alleviate the spread of STIs in a "direct and material way." *Turner I*, 512 U.S. at 664–65, 114 S.Ct. 2445; (Compl. ¶¶ 18–31.)[6] Thus, In-

---

minimis restrictions); *Dream Palace*, 384 F.3d at 1021 (favorably discussing *Schultz* ).

Plaintiffs' briefing argues and their declarations state that not using a condom is intended to communicate a message. (*See* Kross Decl. ¶¶ 12–13 (attesting that [c]ondoms are a reminder of real-world concerns" such as "pregnancy and disease," and that requiring condoms in adult films' hinders those films' aim to "suspend ... concerns [about pregnancy and disease] and allow audience members to suspend their disbelief".)) If condomless sex in adult films is inherently expressive, then requiring condoms would completely block that expression, and strict scrutiny would be required. *Pap's*, 529 U.S. at 293, 120 S.Ct. 1382.

"[T]he Supreme Court has 'extended First Amendment protection only to conduct that is inherently expressive.' " *Wong v. Bush*, 542 F.3d 732, 736 (9th Cir.2008) (quoting *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 66, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006)). An act is inherently expressive if the "likelihood [is] great that the message would be understood by those who viewed it." *Spence v. State of Washington*, 418 U.S. 405, 410–11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). The Supreme Court has cautioned that the "inherently expressive" requirement means that words cannot be used to explain the message that conduct is meant to communicate, because "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." *Rumsfeld*, 547 U.S.

at 66, 126 S.Ct. 1297. Like nude dancing, sexual intercourse performed for the production of adult films inherently expresses an erotic message. *See Pap's*, 529 U.S. at 301, 120 S.Ct. 1382 (pl. op.) (recognizing erotic message of nude dancing); *Dream Palace*, 384 F.3d at 1021 (same). But, without the explanatory declarations, it is unclear what message condom-less sex conveys. Just as the requirement that nude dancers wear pasties and G-strings is viewed as a restriction on expressive conduct, so, too, is the requirement that adult film actors wear condoms a restriction on expressive conduct. Put differently, sexual intercourse performed for adult films and nude dancing both are expressive conduct, but requiring condoms for the former and pasties for the latter are only de minimis restrictions on expressive conduct.

**5.** Public health is a substantial government interest. *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 485, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995).

**6.** Plaintiffs' over and under inclusive claims are also relevant to narrow tailoring. (Compl. ¶¶ 78–90.) Thus, these claims would be more appropriately combined with Plaintiffs' First Amendment claim, which for the reasons discussed above, survives dismissal. *Cf. Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947 n. 13, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) ("Overbreadth has also been used to describe a challenge to a statute that in all its applications directly restricts protected First Amendment activity and does not employ means narrowly tailored to serve

terveners motion to dismiss Plaintiffs' First Amendment claim is DENIED.

### D. *Plaintiffs' Claim That Referendums May Not Implicate the First Amendment*

 Plaintiffs claim that referendums that implicate the First Amendment are inherently invalid, because they do not have legislative records and their findings deserve no deference. This claim appears to focus on Measure B's condom requirement. (Compl. ¶¶ 51–56 (emphasizing Measure B's condom-related findings).) As one court stated, "no court has accorded legislative deference to ballot drafters." *Daggett v. Webster*, No. 98–223–B–H, 1999 WL 33117158, at *1 (D.Me. May 18, 1999). Legislatures receive deference because they are "better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon ... complex and dynamic" issues. *Turner I*, 512 U.S. at 665–66, 114 S.Ct. 2445. Because the referendum process does not invoke the same type of searching fact finding, a referendum's fact finding does not "justif[y] deference." *California Prolife Council Political Action Comm. v. Scully*, 989 F.Supp. 1282, 1299 (E.D.Cal.1998), *aff'd*, 164 F.3d 1189 (9th Cir.1999).

 However, an undeferential review of Measure B's findings does not equate to an automatic resolution in Plaintiffs' favor. It means that Interveners must have a record sufficient for Measure B to withstand intermediate scrutiny, without the benefit of deference. *Yniguez v. Arizonans for Official English*, 69 F.3d 920, 945 (9th Cir.1995), *vacated on other grounds*,

*Arizonans for Official English v. Arizona*, 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997)[7] ("There is no basis in the record to support the proponents' assertion that any of the broad societal interests on which they rely are served by the provisions of Article XXVIII. The absence of any evidence to this effect is of particular significance given that ... Article XXVIII is a ballot initiative and thus was subjected to neither extensive hearings nor considered legislative analysis before passage.") Accordingly, the Court GRANTS dismissal of Plaintiffs' claim that referendums may not implicate the First Amendment.

### E. *Plaintiffs' Prior Restraint Claim*

 "The term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993). "A permitting requirement is a prior restraint on speech and therefore bears a heavy presumption against its constitutionality." *Berger v. City of Seattle*, 569 F.3d 1029, 1037 (9th Cir.2009) (internal quotation marks and citation omitted). Courts in this district have found that a prior restraint exists when an individual must obtain a permit to engage in nude dancing. *Dease v. City of Anaheim*, 826 F.Supp. 336, 342 (C.D.Cal.1993); *Santa Fe Springs Realty Corp. v. City of Westminster*, 906 F.Supp. 1341, 1363 (C.D.Cal.1995) (citing *Dease* and applying that case's logic).

 Interveners claim that Measure B is not a prior restraint because it

a compelling governmental interest.... Whether that challenge should be called 'overbreadth' or simply a 'facial' challenge, the point is that there is no reason to limit challenges to case-by-case 'as applied' challenges when the statute on its face and there-

fore in all its applications falls short of constitutional demands.")

7. "[A]t minimum, a vacated opinion still carries informational and perhaps even persuasive or precedential value." *DHX, Inc. v.*

does not require a permit to show films, it only requires a permit to film certain types of films. This distinction is unhelpful. Prior restraints are presumptively invalid because they chill speech from occurring. "The presumption against prior restraints is heavier—and the degree of protection broader—than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand." *Se. Promotions, Ltd. v. Conrad,* 420 U.S. 546, 559, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). This policy concern would be upended if it were a prior restraint to require a permit for a film to be shown, a book to be published, or a painting to be displayed but not a prior restraint to require a permit for a movie to be filmed, a book to be written, or a painting to be painted. Therefore, Measure B, which requires producers to obtain a permit before shooting "any film, video, multimedia or other representation of sexual intercourse" is a prior restraint.[8]

Plaintiffs argue that Measure B does not provide sufficient procedural safeguards, does not have narrowly tailored require-ments, and gives the County unbridled discretion. The Court generally agrees.[9]

### 1. *Procedural Safeguards*

Plaintiffs focus on the procedural safeguards relating to revoking Measure B permits.[10] Prior restraints that target adult entertainment, as Measure B does, must provide the following procedural safeguards: "the licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained, and there must be the possibility of prompt judicial review in the event that the license is erroneously denied." *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 228, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990) *modified on other grounds, City of Littleton, Colo. v. Z.J. Gifts D–4, L.L.C.,* 541 U.S. 774, 776, 124 S.Ct. 2219, 159 L.Ed.2d 84 (2004) (a prior restraint targeting adult businesses must "assure prompt judicial review of an administrative decision denying a license"). "[T]hese considerations apply to license suspensions and revocations as well as license denials." *4805 Convoy, Inc. v. City of San Diego,* 183 F.3d 1108, 1114 (9th Cir.1999). License suspensions and revo-

---

*Allianz AGF MAT, Ltd.,* 425 F.3d 1169, 1176 (9th Cir.2005).

**8.** Interveners are incorrect in arguing that Plaintiffs must allege that they have applied for a permit in order to challenge Measure B. "Plaintiffs who challenge a permitting system are not required to show that they have applied for, or have been denied, a permit.... They must only have declined to speak, or have modified their speech, in response to the permitting system." *Kaahumanu v. Hawaii,* 682 F.3d 789, 796 (9th Cir.2012); *see id.* (striking down a broad revocation and suspension provision even though "the record indicate[d] that permits ... have been issued as a matter of course, and that the discretionary power reserved in [the revocation and suspension provisions] has never been exercised.") As outlined in the "Background" section and "Standing" subsection, Plaintiffs have modified their speech because of Measure B.

**9.** Plaintiffs' Opposition to the Motion to Dismiss makes a broad, although conclusory, argument that requiring a permit itself is an invalid prior restraint. Docket No. 53 at 13–14. This argument, was not made in Plaintiffs' Preliminary Injunction brief. Docket No. 55 at 8–10. Because Plaintiffs state a valid prior restraint claim without this argument, the Court need not analyze it now.

**10.** The procedural safeguards claims were raised in the complaint, and argued, though only with respect to revocations and suspensions, in Plaintiffs' preliminary injunction motion. (Compl. ¶ 96; Docket No. 55 at 9:7–14

cations differ from the denial of a license application in that "preservation of the status quo means that the suspension or revocation cannot be enforced, and the business is allowed to continue to operate under its license," until there has been a judicial determination. *Id.* Measure B allows for the Department to revoke and suspend a permit, and once revocation or suspension has occurred, a permit holder must "cease filming any adult film." § 11.39.110(D), (H). These provisions of Measure B are, thus, unconstitutional because they provide for suspensions and revocations before a judicial determination.

## 2. Unbridled Discretion

■■■■ Additionally, Government officials cannot have unbridled discretion over permits that implicate First Amendment activity. *G.K. Ltd. Travel v. City of Lake Oswego,* 436 F.3d 1064, 1082 (9th Cir.2006). Here, in order to receive and keep a permit, the following is required: pay for the

(citing provision of Measure B regarding suspensions and revocations).

**11.** Measure B states: "Upon successful completion of the permit application process described in subsection A of this section, the department shall issue an adult film production public health permit to the applicant. The adult film production public health permit will be valid for two years from the date of issuance, unless revoked." § 11.39.080(B). In analyzing another statute that singled out adult entertainment, the Supreme Court held that "the licensor must make the decision whether to issue the license within a specified and reasonable time period." *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 228, 110 S.Ct. 596, 107 L.Ed.2d 603 (1990). Here, in light of the obligation to, when possible, interpret an ordinance in a way that maintains its constitutionality, the Court construes the word "upon" to place sufficiently specific and reasonable time limit for permit authorizations. *See New York v. Ferber,* 458 U.S. 747, 769, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (discussing the importance of interpreting

permit, complete an application, conduct blood-borne pathogen training, post the permit on the worksite, and use condoms during anal and vaginal sex. § 11.39.080–11.39.110; (*see* Compl. ¶ 58.) These criteria are clear and do not leave much, if any, room for discretion. Another Measure B provision, though, is more problematic. (Docket No. 53 at 14:17–15:4.) [11]

■■■■ Measure B, also, provides that after an administrative review, "[t]he Department may ... modify, suspend, revoke or continue all such action previously imposed upon a permittee pursuant to this chapter or impose any fine imposed by law for violations of this chapter or any other law *or standards affecting public health and safety,* including *but not limited to* [certain laws and regulations]." § 11.39.110(F). Thus, Measure B allows, under some circumstances, for the denial of permits when adult film makers violate unnamed, undescribed "standards affecting public health." This is unbridled discretion.[12]

federal law to preserve its constitutionality); *see also Beaulieu v. City of Alabaster,* 454 F.3d 1219, 1232 (11th Cir.2006) (essentially applying the maxim to ordinances); *Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves,* 601 F.2d 809, 822 (5th Cir.1979) (same). Because Webster's (available · at http://www.merriam-webster.com/) defines "upon" to mean "on,", Measure B indicates that applications will be immediately reviewed.

**12.** Plaintiffs also argue that the Department has unbridled discretion in determining which blood-borne pathogen training class meets Departmental approval. (Docket No. 53 at 15:5–11.) The Court need not address this issue because Plaintiffs have otherwise stated a valid prior restraint claim. (*See* Docket No. 55 at 8–10). However, the proper issue is whether the Department has too much discretion in terms of who receives a permit, not whether they have too much discretion in selecting appropriate training classes. *G.K. Ltd.,* 436 F.3d at 1082 (9th Cir.2006) ("The requirement of sufficient di-

■ For similar reasons, portions of § 11.39.110(E) are unconstitutional. If there is "any immediate danger to the public health or safety is found or is reasonably suspected," that provision allows the department to "immediately suspend . . . [a] permit, initiate a criminal complaint and/or impose any fine permitted by [Measure B]." The provision also states: "Immediate danger to the public health and/or safety shall include any condition, based upon inspection findings or other evidence, that can cause, or is reasonably suspected of causing, infection or disease transmission, or any known or reasonably suspected hazardous condition." This provision is too broad—it is not limited to Measure B's requirements, and it applies to conditions "reasonably suspected" to be "suspected of causing" the transmission of unnamed diseases. The department is given no guidance as what types or diseases or what types of transmission methods § 11.39.110(E) applies. Indeed, § 11.39.110(E) would seem to authorize revoking a permit if a cameraman were working with a cold. The discussed portions of § 11.39.110(E), therefore, are unconstitutional.

### 3. *Narrow Tailoring*

■ Pursuant to the most lenient scrutiny that Measure B could be reviewed under, a prior restraint's provisions must be narrowly tailored such that they do "not burden substantially more speech than is necessary to achieve a substantial govern-ment interest." *Berger*, 569 F.3d at 1041. Plaintiffs allege that "Measure B also prohibits the production of any adult film by any entity that has had a permit suspended or revoked." (Compl. ¶ 58.) [13] Because Interveners bear the burden of justifying a prior restraint's restrictions, because an alternative to revoking the permit completely would be revoking the permit only as to the offending film, and because Interveners do not address Plaintiffs' claim that a total revocation is improper, Plaintiffs' prior restraint claim survives. *Id.* at 1035 (discussing the burden), 1041 (holding that "the existence of obvious, less burdensome alternatives is a relevant consideration in determining whether the 'fit' between ends and means is reasonable") (internal quotation marks omitted); Docket No. 49 at 12–15 (ignoring Plaintiffs' revocation argument).

■ Plaintiffs claim that Measure B is not narrowly tailored because, although the condom requirement applies only to vaginal and anal sex, a Measure B permit is required to film much more. A permit is required for "adult films," which are defined as "any film, video, multimedia or other representation of sexual intercourse in which performers actually engage in oral, vaginal, or anal penetration, including, but not limited to, penetration by a penis, finger, or inanimate object; oral contact with the anus or genitals of another performer; and/or any other sexual activity that may result in the transmission

rection for City officials seeks to alleviate the threat of content-based, discriminatory enforcement that arises where the licensing official enjoys unduly broad discretion in determining whether to grant or deny a permit") (internal quotation marks and citation omitted). The appropriate way to challenge the training course requirement, or any other requirement (including the requirement to get a permit), is to do so on narrow tailoring grounds. *Berger*, 569 F.3d at 1041. Since

Plaintiffs do not argue that the blood training course fails a narrow tailoring analysis, the Court will not analyze the issue.

**13.** A Measure B permit is issued to adult film producers. *See generally* § 11.39.080(A). The permit extends for two years, and is applicable to all films a producer makes. *See* § 11.39.080(B). Thus, revocation or suspension means a permit holder cannot produce any adult film.

of blood and/or any other potentially infectious materials."[14] The Court finds Plaintiffs have stated a claim on this issue.

■ As discussed, Measure B's purpose is to prevent the spread of STIs, and requiring condoms is the means by which Measure B seeks to prevent their spread. (*See* Docket No. 58 Ex. B § 2 (Measure B's "findings and declarations"), § 3 ("purpose and intent"). Since Measure B only requires condoms for vaginal and anal sexual intercourse, and since Measure B's purpose is condoms—focused, Plaintiffs have stated a claim that the permit requirement is not narrowly tailored because it applies to adult films without vaginal or anal sexual intercourse.[15]

### F. *Plaintiffs' Fees Claim*

■ Prior restraints may only impose permit fees if they are revenue neutral, because the Government may not charge for the privilege of exercising a constitutional right. *See Murdock v. Pennsylvania*, 319 U.S. 105, 113–14, 63 S.Ct. 870, 87 L.Ed. 1292 (1943); *Cox v. New Hampshire*, 312 U.S. 569, 577, 61 S.Ct. 762, 85 L.Ed. 1049 (1941). The Sixth and Eleventh Circuits have applied this revenue-neutral rule to permit fees on adult entertainment businesses. *Fly Fish*, 337 F.3d at 1314; *729, Inc. v. Kenton*

*Cnty. Fiscal Court*, 515 F.3d 485, 510 (6th Cir.2008). The Eighth Circuit, though, declined to do so. *Jake's, Ltd., Inc. v. City of Coates*, 284 F.3d 884, 890–891 (8th Cir. 2002). In analyzing the contrary Eighth Circuit authority, the Eleventh Circuit noted that even though nude dancing was at the "outer perimeters of the First Amendment," because the government could not completely ban erotic dancing, the government cannot tax it without limit. *Fly Fish*, 337 F.3d at 1315. The Court agrees with the Eleventh Circuit's logic and finds it applies to Measure B's fees.

Courts applying the revenue-neutral rule to adult entertainment require the government to prove that revenues merely cover "the costs of administering [the] licensing program." *Id.* at 1314–15; *729*, 515 F.3d at 510. Even though the permit fee in this case, $2,000–$2,500, is relatively minimal, the Court will not assume that it is constitutionally permissible. *See Fly Fish*, 337 F.3d at 1315 (holding as unconstitutional a $1,250 fee per adult business because the "City ... conducted no real accounting of the costs of administering its licensing program"). Since the Complaint does not allege facts suggesting that the fees are revenue neutral, the fees' claim survives the motion to dismiss. The Court

---

**14.** Although Plaintiffs have not raised the issue, the following clause of the "adult films" definition is problematic: "and/or any other sexual activity that may result in the transmission of blood and/or any other potentially infectious materials." The use of "or" indicates that filmed "sexual activity" that "results in the transmission of ... other potentially infectious materials" requires a Measure B permit. Sexual activity could mean many things. Potentially, kissing could qualify, as saliva may contain infectious materials. Therefore, the portion of adult film's definition discussed in this footnote is unconstitutionally overbroad and vague.

**15.** The Court rejects Plaintiffs' argument in its preliminary injunction brief that Measure B's criminal and civil penalties are not narrowly tailored, and, therefore, constitute an invalid prior restraint. Prior restraint analysis looks to the requirements of and processes associated with obtaining and keeping a permit, not criminal penalties. *Cf Conrad*, 420 U.S. at 559, 95 S.Ct. 1239 ("The presumption against prior restraints is heavier-and the degree of protection broader-than that against limits on expression imposed by criminal penalties. Behind the distinction is a theory deeply etched in our law: a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand.")

notes, for reasons that will be relevant later, that Interveners provide no evidence of revenue neutrality. (*See* Docket No. 57 at 15:14–18.)

### G. *Plaintiffs' Vagueness Claim*

▓▓▓▓ Under the void-for-vagueness doctrine, "legislatures [are required] to set reasonably clear guidelines for law enforcement officials and triers of fact in order to prevent arbitrary and discriminatory enforcement." *Smith v. Goguen*, 415 U.S. 566, 572–73, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974). "Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts." *Id.* at 573, 94 S.Ct. 1242. All that is required is that there be "reasonably clear lines" such that "men of common intelligence [are] not forced to guess at the meaning of the criminal law." *Id.* at 574, 94 S.Ct. 1242 (internal quotation marks and citations omitted).

▓▓▓▓ Plaintiffs' opposition brief and complaint conclusorily state that some of the terms in Measure B are unconstitutionally vague. (Docket No. 53 at 16:14–17; Compl. ¶¶ 71–77.) This is a sufficient reason to dismiss the claim. *See Iqbal*, 556 U.S. at 678–79, 129 S.Ct. 1937.

▓▓▓▓ Measure B defines three of Plaintiffs' challenged terms: "adult film," "exposure control plan," and "producer of adult film."[16] Several other terms are not defined. When statutory terms are undefined, they are given their "ordinary and natural meaning," and courts employ "general usage dictionaries to determine" that meaning. *Castro v. Terhune*, 712 F.3d 1304, 1312 (9th Cir.2013). Measure B requires that "principal and management-level employees" complete blood borne pathogen training. § 11.39.080. Plaintiffs claim that the terms "principal" and "management-level employees" are unclear. Webster defines "principal," in relevant part, as "a person who has controlling authority or is in a leading position." Management is defined as "the collective body of those who manage or direct an enterprise," and manage is defined as "to exercise executive, administrative, and supervisory direction of ⟨manage a business⟩." These terms are sufficiently clear.[17]

Plaintiffs also challenge the following terms: "commercial purposes," "reasonably suspected," "hazardous condition," and "interference." (Docket No. 53 at 16:15–16.) Because Plaintiffs do not analyze these terms' meaning or their potential for confusion, for purposes of this Motion the Court finds that they are not vague.

### H. *Plaintiffs' Due Process Claim*

▓▓▓▓ Plaintiffs assert that Measure B violates their due process rights. The

---

**16.** For reasons discussed in the prior restraint analysis, "adult film" must be narrowed in scope. After striking the offending portions of that term's statutory definition, and adding no new terms, it would be defined as "any film, video, multimedia or other representation of sexual intercourse in which performers actually engage in vaginal or anal penetration by a penis." § 11.39.010.

"Exposure control plan" is defined as: "a written plan that meets all requirements of Title 8 California Code of Regulations sections 3203 and 5193, to minimize employees' risk of exposure to blood or potentially infectious material." § 11.39.050.

"Producer of adult film" is defined as: "any person or entity that produces, finances, or directs, adult films for commercial purposes." § 11.39.075.

**17.** All definitions are available at http://www.merriam-webster.com/.

Fourteenth Amendment prohibits the deprivation "of life, liberty, or property without due process of law." Due process requires "some form of hearing before an individual is finally deprived of [a protected] interest." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Due process claims should be analyzed under the *Mathews v. Eldridge* weighing test. *See id.* at 335, 96 S.Ct. 893. However, Plaintiffs do not engage in such a weighing, and their due process claims generally dismiss the review procedures to which license holders and applicants are entitled under Measure B. (Compl. ¶¶ 91–98); § 11.39.110(B), (D), (E)(2); *see also* Cent. Dist. L.R. 7–5 (moving papers must provide "a brief but complete memorandum in support thereof and the points and authorities upon which the moving party will rely."). The Court, therefore, GRANTS dismissal of Plaintiffs' due process claims, with one exception discussed below. Regardless, Plaintiffs' due process arguments largely duplicate of their prior restraint arguments.

 However, Plaintiffs make a Fourth Amendment challenge in the due process section of the Complaint that warrants further consideration. (Compl.

¶ 95.) [18] Plaintiffs claim that Measure B authorizes an unconstitutional system of warrantless searches and seizures. In a closely regulated industry, administrative warrantless searches are permitted so long as the following conditions are met: (1) "[t]here is [a] 'substantial' government interest that informs the regulatory scheme pursuant to which inspection is made," (2) "warrantless inspection is necessary to further the regulatory scheme," and (3) the "inspection program, in terms of certainty and regularity of its application, must provide a constitutionally adequate substitute for a warrant" (i.e. "it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers"). *New York v. Burger*, 482 U.S. 691, 703, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987) (citations omitted). "In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be carefully limited in time, place, and scope." *Id.* (internal quotation marks and citation omitted).

Plaintiffs' Fourth Amendment allegations and briefing focus on *Burger*'s requirement that administrative searches be

---

**18.** It is an open question whether a facial challenge of an administrative search scheme on Fourth Amendment grounds is permissible. *832 Corp. v. Gloucester Twp.*, 404 F.Supp.2d 614, 620 (D.N.J.2005) (noting the issue is unresolved, but assuming that such a challenge is allowable). In preliminarily enjoining an ordinance that permitted warrantless administrative searches of "Adult–Oriented Businesses," a district court in this circuit noted:

> There is arguably a question as to whether a party can assert a facial challenge to a statute permitting warrantless administrative searches. *See, e.g., S & S. Pawn Shop Inc. v. City of Del City*, 947 F.2d 432, 439–40 (10th Cir.1991) (identifying the issue, but declining to decide it). Despite some hesitation, the court entertains such a challenge

here because the ordinances vest too much discretion in City officials conducting the inspection to qualify as a valid administrative inspection scheme. *See City of Chicago v. Morales*, [527 U.S. 41] 119 S.Ct. 1849 [1866, 144 L.Ed.2d 67] 1999 WL 373152 *15 (June 10, 1999) (Breyer, J., Concurring) ("The ordinance is unconstitutional, not because a policeman applied this discretion wisely or poorly in a particular case, but rather because the policeman enjoys too much discretion in every case").

*Le v. City of Citrus Heights*, No. CIV.S–98–2305WBS/DAD, 1999 WL 420158, at *6 n. 6 (E.D.Cal. June 15, 1999). Finding *Le*'s facts sufficiently analogous and its reasoning persuasive, this Court concludes a facial challenge is permissible.

limited in time, place, and scope. (Compl. ¶ 95.) Specifically, Measure B states:

> The county health officer may enter and inspect any location suspected of conducting any activity regulated by this chapter, and, for purposes of enforcing this chapter, the county health officer may issue notices and impose fines therein and take possession of any sample, photograph, record or other evidence, including any documents bearing upon adult film producer's compliance with the provision of the chapter. Such inspections may be conducted as often as necessary to ensure compliance with the provisions of this chapter.

§ 11.39.130. The "any location" language of § 11.39.130 violates the Fourth Amendment. In upholding warrantless administrative searches, courts emphasize the limited nature of what may be searched. *United States v. Delgado*, 545 F.3d 1195, 1203 (9th Cir.2008) (holding that a statute was constitutional in part because it was "limited to commercial vehicles,"); *Burger*, 482 U.S. at 711, 107 S.Ct. 2636 (emphasizing that the statute was limited to "vehicle dismantling business[es]"). Given that adult filming could occur almost anywhere, Measure B would seem to authorize a health officer to enter and search any part of a private home in the middle of the night, because he suspects violations are occurring. This is unconstitutional because it is akin to a general warrant. Therefore, the Court DENIES dismissal of Plaintiffs' Fourth Amendment claim. *See Rush v. Obledo*, 756 F.2d 713, 717, 722 (9th Cir.1985) (holding that a statute "authoriz[ing] any officer, employee, or agent of the Department to enter and inspect any place providing personal care, supervision, and services at any time, with or

without notice, to secure compliance with, or to prevent a violation of, any applicable statute" unconstitutional because it "permitt[ed] general searches at any time of any place providing care and supervision to children"); *United States v. 4,432 Mastercases of Cigarettes, More Or Less*, 448 F.3d 1168, 1180 (9th Cir.2006) (stating that the procedural safeguards of warrantless administrative searches that implicate homes must be strong and citing *Rush* as "str[iking] down as unconstitutional a regulation that enabled warrantless searches of family-home day care facilities because it failed to place any limits on the time of searches, the area that could be searched, or the regularity of searches").[19]

## IV. *Preliminary Injunction Analysis*

Because Plaintiffs' First Amendment claim regarding Measure B's condom requirement is unlikely to succeed on the merits, the Court DENIES a preliminary injunction on that issue. As detailed below, the Court GRANTS a preliminary injunction on Plaintiffs' other claims that survived the motion to dismiss.

### A. *Plaintiffs' First Amendment Claim*

■ The First Amendment claim, which focuses on narrow tailoring (and specifically testing as an adequate alternative to condoms), is unlikely to succeed on the merits. Plaintiffs focus their First Amendment analysis on arguing that Measure B's condom requirement should be reviewed under strict scrutiny. (Docket No. 55 at 7–8.) However, for the reasons discussed in the motion to dismiss analysis, intermediate scrutiny should be employed.

---

**19.** Under very different circumstances, a narrow and constrained warrantless administrative search of a home is permissible. *See*

*Rush*, 756 F.2d at 717 (upholding such a search when regulations limited a statute's reach).

Plaintiffs also make a narrow tailoring argument. *Id.* at 5:3–6. Interveners have presented evidence that the harms Measure B targets "are real, not merely conjectural, and that [Measure B] will in fact alleviate those harms in a direct and material way." *Turner I,* 512 U.S. at 664–65, 114 S.Ct. 2445. Jonathan Fielding, the Director and Health Officer at the Los Angeles County Department of Public Health, has stated:

> Since 2004 DPH received reports of 2,396 cases of Chlamydia (CT), 1389 cases of gonorrhea (GC), and five syphilis cases among AFI performers; 20.2% of performers diagnosed with STD had one or more repeat infections within a one year period. Between 2004 and 2008, repeat infections were reported for 25.5% of individuals. Due to the failure to routinely screen for rectal and oral pharyngeal infections, a sustained high level of endemic disease among AFT workers persists. Furthermore, these disease rates and reinfection rates are likely to be significantly underestimated as rectal and oral screening is not done routinely and these anatomic sites are likely to be a reservoir for repeat reinfection. Analyses of 2008 data also indicated that AFI performer experience significantly higher rates of infection (20%) than the general public (2.4%) or in the area of the County (SPA 6) experiencing the highest rates of STDs (4.5%).

> Data is less clear for HIV since occupation is not reported in HIV/AIDS reports. Since 2004, AIM has reported 25 cases of HIV. However, it is difficult to confirm the number of actual performers infected with HIV/AIDS as not all those tested are current performers and may

have other roles in the AFI, or are partners of an AFI performer, or may otherwise be referred to AIM for testing. AIM claims that a minority of the 25 cases are performers, but even if this is accurate, it is reasonable to assume that some of the remaining 25 infected individuals were tested because they wished to work in the AFI in Los Angeles or were partners of AFI performers.

(Docket No. 58–1 Ex. A at 2.) Plaintiffs, by contrast, have presented evidence from individuals in the adult film industry, but not in the public health or medical profession, who claim testing is so effective and universal that condoms are unnecessary. (*See, e.g.,* Hirsch Decl. ¶¶ 8–16). Plaintiffs' and Interveners' evidence are in tension. However, the Court finds the Department of Public Health's detailed explanation compelling, especially in light of its unique role in protecting the community's health.

Interveners' evidence also indicates that Measure B does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Turner I,* 512 U.S. at 665, 114 S.Ct. 2445. Measure B "need not be the least restrictive or least intrusive means available." *Berger,* 569 F.3d at 1041. Here, Interveners' evidence indicates that testing for STIs has proven insufficient to prevent their spread. (Docket No. 58–1 Ex. A at 2.) Because testing is Plaintiffs' proffered alternative, and because evidence indicates it may be ineffective, requiring condoms is a permissible way (at least at this stage) to target and prevent the spread of STIs. For these reasons, Plaintiffs' claim challenging the condom requirement is not likely to succeed on the merits.[20]

---

**20.** Plaintiffs' over and under inclusive arguments also bear on narrow tailoring. However, these arguments fail to show that Plaintiffs are likely to succeed on the merits. Plaintiffs

fault Measure B for not applying generally to the entire population of Los Angeles County. (Docket No. 55 at 13:14–16.) However, Measure B would be patently unconstitutional

### B. *Plaintiffs' Remaining Claims*

Plaintiffs' claims concerning the following Measure B provisions are likely to succeed on the merits: the fees provision, the administrative search provision, and the prior restraint provisions explicitly found to have survived the motion to dismiss. The fees provision and the prior restraint provision concerning Measure B's broad revocation policy (i.e. that a revoked permit means a producer cannot work on any adult films, instead of simply the offending film) are likely to succeed on the merits because Interveners' have offered no evidence that these provisions are narrowly tailored. (*See* Docket No. 57 at 14–15 (not discussing the broad revocation policy), 15:14–18 (faulting Plaintiffs for providing no evidence concerning the fee's reasonableness, but providing no evidence that the fee is revenue neutral)); *Turner I,* 512 U.S. at 664–65, 114 S.Ct. 2445 (indicating that Interveners bear the burden of proving narrow tailoring). The remaining provisions are likely to succeed on the merits because, as discussed previously, Measure B's text indicates they are unconstitutional.

 Once a Plaintiff shows that a constitutional rights claim is likely to succeed, the remaining preliminary injunction factors weigh in favor of granting an injunction. *Melendres v. Arpaio,* 695 F.3d 990, 1002 (9th Cir.2012) ("[T]he deprivation of constitutional rights unquestionably constitutes irreparable injury.... [I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (internal quotation marks and citations omitted); *Klein v. City of San Clemente,* 584 F.3d 1196, 1208 (9th Cir.2009) ("The balance of equities and the public interest thus tip sharply in favor of enjoining the ordinance. As our caselaw clearly favors granting preliminary injunctions to a plaintiff like Klein who is likely to succeed on the merits of his First Amendment claim, we see no reason to remand for further proceedings with respect to Klein's motion in this case.")

### C. *Severability*

 Whether Measure B's offending provisions are severable is a "a matter of state law." *Leavitt v. Jane L.,* 518 U.S. 137, 139, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996). "Invalid provisions of a statute should be severed whenever possible to preserve the validity of the remainder of the statute." *Briseno v. City of Santa Ana,* 6 Cal.App.4th 1378, 1384, 8 Cal. Rptr.2d 486 (1992). "The California Supreme Court has held that there are three criteria for severability under California law: the provision must be grammatically, functionally, and volitionally separable." *Valley Outdoor, Inc. v. Cnty. of Riverside,* 337 F.3d 1111, 1114 (9th Cir.2003). How-

---

if it applied to individuals having sex in a private place for non-commercial purposes. *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Lawrence v. Texas,* 539 U.S. at 562, 123 S.Ct. 2472 (2003). Sex in public places appears to be already prohibited by public decency laws. *See* Los Angeles County Code § 13.22.020. Plaintiffs' also claim that Measure B "applies only to adult films produced for a commercial purpose, to the exclusion of non-commercial films whose performers are exposed to risks (accepting arguendo the Measure's assumptions) that are the same as those for perform-

ers in commercial adult entertainment." (Docket No. 55 at 13:14–16.) But Plaintiffs provide no evidence about these "non-commercial" films, such as the percent of adult films that are non-commercial and that could be regulated without violating the type of privacy rights expressed in *Griswold* and *Lawrence.* Besides, intermediate scrutiny does not require a perfect fit, *Berger,* 569 F.3d at 1041, and at this stage Interveners have provided evidence that the adult film industry is uniquely problematic in the spread of STIs. (Docket No. 58–1 Ex. A.)

ever, "[t]he final determination depends on whether the remainder . . . is complete in itself and would have been adopted by the legislative body had the latter foreseen the partial invalidity of the statute . . . or constitutes a completely operative expression of the legislative intent . . . [and is not] so connected with the rest of the statute as to be inseparable." *Id.* (quoting *Calfarm Ins. Co. v. Deukmejian,* 48 Cal.3d 805, 821, 258 Cal.Rptr. 161, 771 P.2d 1247 (1989)).

 As an initial matter, Measure B contains an unambiguous severability clause: "If any provision of this Act, or part thereof, is for any reason held to be invalid or unconstitutional, the remaining provisions shall not be affected, but shall remain in full force and effect, and to this end the provisions of the Act are severable." Docket No. 58 Ex. B § 8.[21] This clause establishes that the voters wanted Measure B, even if portions were found unconstitutional, to survive, if at all possible. "Although not conclusive, a severability clause normally calls for sustaining the valid part of the enactment." *Calfarm Ins. Co. v. Deukmejian,* 48 Cal.3d 805, 821, 258 Cal.Rptr. 161, 771 P.2d 1247 (1989)

 "An enactment passes the grammatical test where the language of the statute is mechanically severable, that is where the valid and invalid parts can be separated by paragraph, sentence, clause, phrase or even single words." *Barlow v. Davis,* 72 Cal.App.4th 1258, 85 Cal.Rptr.2d 752 (1999). The permit fee requirement is easily separable from its relevant provisions. The same is true of the provisions concerning revoking and suspending Measure B permits.[22]

The provision authorizing administrative searches is self contained, so enjoining it creates no grammatical issues. § 11.39.130.

In § 11.39.110(F), which concerns the Department's authority to revoke a permit and levy other penalties against a permittee after an administrative review, the following words can be stricken without any grammatical problems: "modify, suspend, revoke or any other laws or standards affecting public health and safety, including but not limited to the Los Angeles County Code, the California Health and Safety Code, the blood borne pathogen standard, California Code of Regulations Title 8, section 5193 or the exposure control plan of the permittee, or any combination thereof, or for interference with a county health officer's performance of duty." [23] The provision requiring permits

---

**21.** It is unclear where this severability clause was codified within the Los Angeles County Code.

**22.** Had the Court only enjoined the revocation and suspension provisions of Measure B on grounds that the status quo is disrupted before judicial review, the Court would have only enjoined the County from "enforcing a license suspension or revocation for ninety days after an administrative appeal becomes final, the time allowed for filing a writ of administrative mandamus under the California statutory scheme." *Convoy,* 183 F.3d at 1116.

**23.** That is to say, § 11.39.110(F) paragraph makes grammatical sense when read as follows: "The department may, after an admin-istrative review or waiver thereof continue all such action previously imposed upon a permittee pursuant to this chapter or impose any fine imposed by law for violations of this chapter." Thus, what remains of § 11.39.110(F) is the Department's authority to initiate fines or criminal charges, as provided for in Measure B for Measure B violations only, against Measure B violators. Of course, this order affects no other provision of law outside of Measure B. Although the term "modify" has not previously been discussed, it is also unconstitutional as its vagueness permits unbridled discretion, and, given its undefined scope, allows the Department to effectively suspend or revoke a license. *See G.K. Ltd.,* 436 F.3d at 1082 (discussing unbridled discretion).

for anything other than vaginal or anal sexual intercourse can be similarly successfully edited.[24] The provision concerning emergency fines and revocations, § 11.39.110(E), is not completely self contained, as it continues to § 11.39.110(E)(1)-(2). Therefore, subsections (1) and (2) of § 11.39.110(E) are also be enjoined.

 Under the functionality test, the Court must decide whether Measure B remains "operational" without the offending language. *Valley Outdoor,* 337 F.3d at 1114. Here, adult film actors must still use condoms. A permit is still required. Although the permit may not be modified, suspended, or revoked, fines and criminal charges may still be brought against offenders, as described in footnote 23.

While administrative searches cannot occur, nothing prevents law enforcement from obtaining a warrant to enforce Measure B.

Regarding fees, since there is no evidence that Measure B's fees are revenue neutral, there is no reason to believe the Department's Measure B duties cannot be performed without fees—or performed at least until the fees' defect is cured, either by enacting a new, constitutional ordinance or providing this Court with evidence of revenue neutrality. *See Wal Juice Bar, Inc. v. City of Oak Grove,* No. CIV. A. 5:02CV–252–R, 2005 WL 2333636, at *5–6 (W.D.Ky. Sept. 22, 2005) (deciding that a license fee for sexually-oriented businesses was unconstitutional, but stating that the fee was severable in part because the ordinance remained functional without the fee provision). For these reasons, Measure B remains operational.

 The volitional test asks "whether it can be said with confidence

that the electorate's attention was sufficiently focused upon the parts to be severed so that it would have separately considered and adopted them in the absence of the invalid portions." *Gerken v. Fair Political Practices Com.,* 6 Cal.4th 707, 714–15, 25 Cal.Rptr.2d 449, 863 P.2d 694 (1993). A ballot initiative passes the volitional test when "it seems eminently reasonable to suppose that those who favored the proposition would be happy to achieve at least some substantial portion of their purpose." *Id.* at 715, 25 Cal.Rptr.2d 449, 863 P.2d 694. Here, in light of Measure B's stated purpose of preventing the spread of STIs and for the reasons discussed above in the operational analysis, it seems that those who "favored [Measure B] would be happy to achieve" what remains of it. *Id.*

## V. *Conclusion*

As set forth above, this Court GRANTS in part and DENIES in part Interveners' Motion to Dismiss, and GRANTS in part and DENIES on part Plaintiffs' Motion for a Preliminary Injunction.

In light of this Order, Plaintiffs' motion for judgment on the pleadings is vacated. (Docket No. 64.)

IT IS SO ORDERED.

---

**24.** § 11.39.010 then reads: "An 'adult film' is defined as any film, video, multimedia or other representation of sexual intercourse in which performers actually engage in vaginal, or anal penetration by a penis."